# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| DANIEL CARNINE, CHAD WEAVER, JEFFREY JORDAN, THOMAS MACKEY, and TORY SKYERS, on behalf of themselves and all other individuals similarly situated, | Case No. 2:24-cv-11004 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| GENERAL MOTORS LLC, ONSTAR, LLC, and LEXISNEXIS RISK SOLUTIONS, INC., | |
| Defendants. | |

Plaintiffs Daniel Carnine, Chad Weaver, Jeffrey Jordan, Thomas Mackey, and Tory Skyers (collectively, "Plaintiffs") file this Class Action Complaint against Defendants General Motors LLC ("General Motors"), OnStar LLC ("OnStar") (collectively, "GM" or the "GM Defendants"), and LexisNexis Risk Solutions, Inc. ("LexisNexis") (together with GM, the "Defendants"), and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters.

1

## INTRODUCTION

1.      This case stems from GM's longstanding surreptitious collection and sale of customer driver data telemetry (the "driver data") without Plaintiffs' and Class Members' knowledge or consent.

2.      Although GM claimed to only collect and share driver data with insurance companies with the customers' "express consent," GM routinely violated their promises to customers and their own privacy policy and terms of service by secretly sharing the driver data with data brokers such as LexisNexis.

3.      The driver data collected includes acceleration events, hard brake events, high speed events, distance traveled, time of day traveled, vehicle information such as VINs, and sometimes location data and GPS data.

4.      This driver data was subsequently packaged by LexisNexis and sold to insurance companies where, due to a multitude of factors including lack of context and inaccurate data, it severely harmed GM's customers including Plaintiffs and Class Members.

5.      On March 11, 2024, the *New York Times* published an article exposing elements of GM's data sharing practices. In the aftermath of the *New York Times*' investigation, GM announced on March 22, 2024 that they would stop sharing driver data with third parties such as LexisNexis.

6.     Importantly, Plaintiffs and Class Members did not consent to GM's collecting or sharing of their driver data through GM's *OnStar* Smart Driver system or any other system.

7.     The *OnStar* Smart Driver program is a system that GM ostensibly included to help customers improve their driving for "safety" and allowed customers to access driver data. GM, however, did not adequately disclose that it also provided this same driver data to data brokers and insurance companies.

8.     GM also collected data from Plaintiffs and Class Members who did not "opt in" to the Smart Driver program. Nevertheless, this driver data appears to have been sent to data brokers such as LexisNexis even for customers who had not enrolled in the Smart Driver program or who had opted out.

9.     Even for those Plaintiffs and Class Members who opted-in to the Smart Driver program, GM did not adequately disclose how their driver data would be used.

10.    Specifically, on the FAQ for the "Smart Driver" program, GM represented that it would not share driver data with insurers without the Customer's "Express Consent." However, no terms in GM's Terms of Service, Privacy Policy, or other documents would constitute "express consent" to sell customer data to insurance companies and data brokers. To the contrary, many of these documents and terms foreclose any ability for GM to surreptitiously sell this data.

11.    GM's about-face decision to stop selling this driver data shortly after the *New York Times* exposed its deficient privacy practices further supports that its customers were not aware of GM's surreptitious data collection and sharing.

12.    Moreover, the driver data that GM sold was flawed and was often inaccurate or incomplete. GM understood that this flawed driver data would likely be relied upon by insurance companies in deciding whether to provide insurance and in calculating insurance premiums, yet they sold it anyway.

13.    Millions of GM customers who had no knowledge that their data was being sold have been harmed. Many, including Plaintiffs and Class Members, have seen massive increases in their insurance premiums as a result of GM's data sharing practices. Indeed, Plaintiffs and Class Members are losing hundreds or even thousands of dollars every six months as a direct result of having their driver data shared without their consent.

14.    Plaintiffs and Class Members had a reasonable expectation of privacy in their driver data and no reason to suspect it was being secretly logged and sold by their car's manufacturer.

15.    Plaintiffs and Class Members suffered immediate harm from increased insurance premiums, are suffering and are likely to suffer long-term harm from ongoing increased premiums, as well as the loss of their driver data. As such, Plaintiffs and Class Members are entitled to compensatory, consequential,

4

statutory, punitive, general, and nominal damages, disgorgement and restitution, and injunctive relief as described below.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The putative class contains millions of members, many of whom have citizenship diverse from Defendants.

17.    This Court has personal jurisdiction over the GM Defendants because their headquarters and principal place of business is located in this District.

18.    This Court has personal jurisdiction over LexisNexis because it is registered to do business as a corporation in the State of Michigan with the Michigan Department of Licensing and Regulatory Affairs.

19.    Furthermore, Defendants transact business and are admitted to conduct business in Michigan; maintain substantial contacts in Michigan; and committed the violations at least in part in Michigan.

20.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims emanated from activities within this District, and Defendants conduct substantial business in this District.

## PARTIES

### *Plaintiffs*

21.     Plaintiff Daniel Carnine ("Plaintiff Carnine") is a resident and citizen of the State of California. Plaintiff Carnine is a current owner of a 2018 Chevy Volt.

22.     GM sold Plaintiff Carnine's driver data to LexisNexis without his knowledge or consent. Plaintiff Carnine did not opt into any arrangement to share his driver data with his insurance company, nor would he have done so.

23.     Plaintiff Carnine has suffered resulting harm both from the permanent loss of his driver data, which was unlawfully sold, and in significantly increased insurance premiums charged as a result.

24.     Plaintiff Chad Weaver ("Plaintiff Weaver") is a resident and citizen of the State of Alabama. Plaintiff Weaver is a current owner of a 2023 Corvette Stingray. He also owned a 2018 model corvette between April 2018 and May of 2022.

25.     GM sold Plaintiff Weaver's driver data to LexisNexis without his knowledge or consent. Plaintiff Weaver did not opt into any arrangement to share his driver data with his insurance company, nor would he have done so.

26.     Plaintiff Weaver has suffered resulting harm both from the permanent loss of his driver data, which was unlawfully sold, and in significantly increased insurance premiums charged as a result.

27.    Plaintiff Jeffrey Jordan ("Plaintiff Jordan") is a resident and citizen of the State of Nevada. Plaintiff Jordan is a current owner of a 2023 Chevrolet Colorado.

28.    GM sold Plaintiff Jordan's driver data to LexisNexis without his knowledge or consent. Plaintiff Jordan did not opt into any arrangement to share his driver data with his insurance company, nor would he have done so.

29.    Plaintiff Jordan has suffered resulting harm both from the permanent loss of his driver data, which was unlawfully sold, and in significantly increased insurance premiums charged as a result.

30.    Plaintiff Thomas Mackey ("Plaintiff Mackey") is a resident and citizen of the State of Florida. Plaintiff Mackey is a current owner of a 2024 Cadillac CT4V Blackwing.

31.    GM sold Plaintiff Mackey's driver data to LexisNexis without his knowledge or consent. Plaintiff Mackey did not opt into any arrangement to share his driver data with his insurance company, nor would he have done so.

32.    Plaintiff Mackey has suffered resulting harm both from the permanent loss of his driver data, which was unlawfully sold, and in significantly increased insurance premiums charged as a result.

33.    Plaintiff Tory Skyers ("Plaintiff Skyers") is a resident and citizen of the State of Florida. Plaintiff Skyers is a current owner of a 2019 Cadillac CTS V.

7

34.     GM sold Plaintiff Skyers's driver data to LexisNexis without his knowledge or consent. Plaintiff Skyers did not opt into any arrangement to share his driver data with his insurance company, nor would he have done so.

35.     Plaintiff Skyers has suffered resulting harm both from the permanent loss of his driver data, which was unlawfully sold, and in significantly increased insurance premiums charged as a result.

### Defendants

36.     Defendant General Motors, LLC ("General Motors") is a limited liability company organized under the laws of the State of Delaware. General Motors has its headquarters and principal place of business in Detroit, Michigan.

37.     General Motors is one of the oldest and largest automotive manufacturing companies in the world and operates internationally. General Motors' brands include Buick, Cadillac, Chevrolet, and GMC. General Motors sells millions of cars throughout the United States.

38.     Defendant OnStar, LLC ("OnStar") is a limited liability company organized under the laws of the State of Delaware. OnStar has its headquarters and principal place of business in Detroit, Michigan. OnStar is a subsidiary of General Motors.

39.    OnStar provides an array of communications and technical services to General Motors vehicles on a subscription basis including the "OnStar Smart Driver" system.

40.    Defendants General Motors and OnStar are collectively referred to as "GM" or the "GM Defendants."

41.    GM's annual revenue from its driver data sharing program is reported to be in the millions of dollars.

42.    Defendant LexisNexis Risk Solutions Inc. ("LexisNexis") is incorporated under the laws of the State of Delaware. LexisNexis has its headquarters and principal place of business in Alpharetta, Georgia.

43.    LexisNexis is a global data and analytics company that provides data and technology services, analytics, predictive insights, and fraud prevention for a wide range of industries, including the automotive industry.

44.    LexisNexis and GM began their data sharing relationship at least as early as August 2019.

## FACTUAL ALLEGATIONS

### A.    GM's Data Collection Practices

45.    General Motors was founded in 1908 and, as of 2023, was the largest automaker in the United States by sales.

46.     In 1996, General Motors launched *OnStar*, a suite of information services the company provides to drivers through its subsidiary, Defendant OnStar, LLC.

47.     *OnStar* enabled General Motors to be the first automaker to bring "connected car" features to its vehicle fleet. These "connected car" features allow automakers to provide additional internet-enabled services through the use of cellular radios, Wi-Fi, geolocation devices, and the car's own internal sensors. These internet-enabled features allow GM to track a driver's use of their vehicle.

48.     For years, in addition to using its *OnStar* "connected car" features to provide services to drivers, GM was also using *OnStar* and its related driving applications to surreptitiously to collect customer's driver data without their knowledge or consent.

49.     GM subsequently sold this driver data to data brokers, including LexisNexis, for their own business benefit and profit. GM understood that data brokers could and would sell this information to other companies, including insurance carriers, which they did.

50.     GM also knew that the sale of driver data would directly harm at least some customers because it would serve as the basis for increasing their insurance premiums.

51.     GM understood that the collected driver data could be inaccurate, flawed, and lack context. GM further understood it is highly likely that when insurance companies receive flawed information, they will use it to make flawed decisions, including decisions that would directly harm unsuspecting GM customers, including Plaintiffs and Class Members.

52.     GM understands that its customers do not want higher insurance premiums. GM also understands that the driver data it provides, while extensive, lacks certain critical contextual identifiers. This means that, for example, insurance premiums might increase dramatically for a GM customer who engaged in sport driving on a track or on highways and turnpikes with higher speed limits because the high speeds and sudden stops and starts could flag them as a 'dangerous driver.'

53.     GM did not warn customers of this risk, and indeed it did not inform them that they were selling this information to third parties at all.

54.     The driver data collected is extremely granular and includes breaking and hard breaking events, acceleration events, speeds over 80 miles per hour, average speed, late night driving, seat belt usage, number of miles driven, and when and where these events occur. The amount of information from individual customers and Plaintiffs can easily expand into the hundreds of pages per person.

55.     GM understood that when they sold this information to data brokers, like LexisNexis, that they would in turn be selling the driver data to insurance companies.

56.     GM did not disclose to Plaintiffs and Class Members that they shared this information with data brokers, such as LexisNexis, and in turn insurance companies, and that they would do so without the customer's express permission.

57.     Instead, GM attempted to shift the blame to customers for "opting in" when it was GM's own deceptive practices that made it impossible for drivers to understand the severe privacy implications of GM's data collection practices.

58.     GM's data collection practices were deceptive on several different levels.

59.     First, GM represented it would only collect this driving information if customers opted into, and affirmatively enrolled in its *OnStar* Smart Driver system. In reality, driving information was often collected from customers who had not knowingly enrolled in the Smart Driver program.

60.     Second, GM assured customers that even with respect to the Smart Driver program, driver data would only be shared with insurance companies if the customers gave their "express consent." However, the information was routinely shared with insurance companies and through data brokers without GM obtaining any such express consent.

61.    Indeed, GM assured customers they were not sharing driver data with data brokers such as LexisNexis while actively sharing such driver data.

62.    Third, GM's terms of service were convoluted and contradictory, making it impossible for an ordinary consumer to understand the terms. These terms were designed to obscure GM's privacy practices.

**B.    GM Failed to Notify Plaintiffs and Class Members That It Was Selling Their Data to Third-Party Data Brokers**

63.    GM operates a byzantine maze of terms of service, privacy policies, and application license agreements. This complex and confusing web of obtuse language appears deliberately designed to confuse and confound any consumer who attempts to understand GM's purported terms. Indeed, the language of the many linked or referenced forms are often mutually contradictory.

64.    Moreover, these documents fail to disclose GM's data collection and sales practices. To the extent that there is *any* disclosure at all, such a disclosure is inadequate given the scale and scope of GM's data harvesting.

65.    For example, understanding even the terms of service and privacy policy for a single app (for example, the MyChevrolet app), involves navigating numerous different and contradictory documents. This web is relatively simple compared with other documents, such as those related to the purchase of a car, and it illustrates the extent to which GM attempts to intentionally obfuscate and deceive customers.

66.     Plaintiffs and Class Members are not asked to click any button accepting the terms or expressing affirmative consent of an intent to be bound by an agreement or contract. Rather, GM attempts to incorporate its terms to through links or references to other agreements, forcing Plaintiffs and Class Members to navigate numerous nested legal documents. These include:

a.  A license agreement in the Apple and Google Play app stores, which contains an unclickable link that must be pasted into a browser to access. This webpage in turn contains links to several other webpages with additional terms and conditions in addition to a fifty-four page "User Terms for Connected Vehicle Services" document;

b.  A separate "User Terms for Application Services," which also contains multiple references to other documents and links including a reference for customers to visit the *OnStar* mobile app homepage for additional "details and limitations;"

c.  A reference to a document entitled "General Wireless Service Terms: Subject to the Session-Based Wireless Data Services Agreement," which does not appear on GM's website;

d.  An OnStar Privacy Statement for Application Services;

e.  A General Motors "U.S. Connected Services Privacy Statement;"

f.  A General Motors "California Consumer Privacy Statement" (which is poorly formatted and contains numerous critical undefined terms); and

g.  A new "User Terms For Application Services," which is only available to customers after they download the application and which appears to be different from the version found online (including a different date, different links to online documents, and different language).

67.    These documents and webpages, which are a non-exclusive list of purportedly binding documents and statements referenced in a daisy chain of links from the original online terms of service, include mutually contradictory elements and are virtually impossible for a reasonable consumer to understand (or even know they are agreeing to).

68.    Most importantly, *none* of these documents disclosed to Plaintiffs and Class Members that their sensitive driver data would be collected and sold to data brokers such as LexisNexis.

**C.    GM's Terms of Service and Privacy Policies Do Not Permit the Sale of Plaintiffs' Driver Data to Data Brokers**

69.    Nothing in the immense web of terms of service and privacy agreements GM created permitted them to sell personalized and individually identifiable driver data to data brokers. In fact, GM expressly promised the opposite.

70.    Specifically, GM misled its customers about what data was being shared with insurance companies. For example, as of January 16, 2024, GM stated

the following on their website in a section specifically describing the services offered

by Smart Driver:[1]

**How does OnStar protect against personally identifiable information from being shared?**

OnStar takes the security of its Members' data very seriously. We use technical, administrative and physical safeguards designed to help protect Members' information from loss, misuse and unauthorized access, disclosure, alteration, destruction or theft. OnStar doesn't share personally identifiable information with an insurance company without your express consent.

71.    GM's promise is clear and unambiguous. GM must not "share personally identifiable information" without a person's ***express consent.***

72.    The language is specific and binding. Indeed, because this help document is specifically aimed at answering questions about the OnStar Smart Driver system, even if a customer were to legitimately "opt-in" to the OnStar Smart Driver system, they do not agree to allow GM to share their driver data with data brokers such as LexisNexis and, in turn, with insurance companies, without their further express consent.

73.    However, after the *New York Times* exposed that GM was, in fact, sharing customers' driver data with data brokers without their express consent, GM

---

[1] *See* https://web.archive.org/web/20240116231547/https://www.onstar.com/support/faq/smart-driver (last accessed Apr. 3, 2024).

removed this statement from their website—implicitly admitting that it was incorrect.

74.     Following the *New York Times* report, GM modified this statement to read as follows:

**How does GM protect personal information?**

GM takes the security of its customers' data very seriously. We use technical, administrative, and physical safeguards designed to help protect customers' information from loss, misuse and unauthorized access, disclosure, alteration, destruction, or theft.

75.     GM's deceptive statements were not confined to their website's help pages but were revealed in their privacy policy. Importantly, GM's privacy policy discloses a comprehensive list of ways that it may use customer data:[2]

---

[2] *See* https://www.onstar.com/legal/privacy-statement (last accessed Apr. 3, 2024).

— **HOW WE MAY USE YOUR INFORMATION**

We may use your information in order to:

- provide our products, programs, and services
- improve the quality, safety, and security of our Connected Services
- develop new Connected Services, including autonomous vehicle and car-sharing Connected Services
- maintain customer relationships and communicate with you
- administer your account(s) and process your payments for Connected Services
- operate our websites and applications, including online registration processes
- provide customer and vehicle support and service (*for example, recall information and maintenance or warranty servicing*)
- for warranty administration and validation
- provide product and service updates
- evaluate the quality, safety, and security of our Connected Services
- collect outstanding debts for Connected Services
- for research, evaluation of use, and troubleshooting purposes
- protect the safety of you or others
- verify eligibility for vehicle purchase and incentive programs
- verify eligibility for GM Card and provide GM Card account management services
- perform marketing, including interest-based marketing and advertising across your devices (with necessary consents)
- administer your participation in contests, quizzes, surveys, promotions and offers
- customize and improve communication content and your experience with GM
- comply with legal, regulatory or contractual requirements
- protect our rights, or to detect, investigate, and prevent fraud or other illegal activity

76.     Despite the length and detail of this list, nowhere does GM disclose that customer information may be shared with or sold to data brokers or that the purpose of such sales are to allow these companies to use the driver data to adjust customers' insurance eligibility and premiums.

77.     GM also includes a section which purports to describe how they may share information including in "third-party business relationships." However, nothing in this section permits GM to sell driving data to brokers like LexisNexis, which have no relationship with the customer and offer no services to them.

78.     Moreover, GM's Privacy Policy further explains the difference between *personally identifiable information* and information which is "de-identified."[3] Specifically, the policy provides that GM can only use information that cannot be "reasonably associated with you or your vehicle" for "any legitimate business purpose" including sharing with third parties.

79.     By necessary implication, identifiable information—which is directly associated with specific individuals and their vehicles—***cannot*** be used for "any legitimate business purpose." Rather, identifiable information can only be used as permitted by the Privacy Policy. The Policy does not permit the sale of data to third-party data brokers.

80.     Moreover, with respect to California residents, GM provided a chart reflecting the types of information they gathered and with whom the sensitive data would be shared.[4] Across all relevant categories—including geolocation data—GM affirmatively represented they do not sell or share this kind of data. This disclosure further confirms that GM represented to its customers that it would not sell or share personally identifiable driver data with data brokers.

---

[3] *Id.*

[4] *See* https://www.onstar.com/content/dam/onstar/na/us/en/index/legal/privacy-statement/02-pdfs/California_Privacy_Statement_070123_final.pdf.html (last accessed Apr. 3, 2024).

### D. LexisNexis's Sale of Driver Data to Insurance Companies Further Violates GM's Promise to Safeguard Their Customers' Data.

81.     GM sold driver data, which it should not have collected and which it had a duty to safeguard.

82.     GM further expressly represented that any service providers it shared information with would be bound by similar security and confidentiality measures.

83.     LexisNexis's subsequent sale of the same driver data to insurance companies further violates GM's promises. Specifically, GM's Privacy Statement promises:

— **HOW WE SAFEGUARD YOUR INFORMATION**

We maintain reasonable technical, administrative, and physical security and confidentiality measures designed to help protect your information from unauthorized access or use. We also require (other than in certain emergency situations) third party service providers acting on our behalf or with whom we share your information to provide similar security and confidentiality measures.

84.     Even if it was permissible for GM to sell its customers' identifiable driver data to LexisNexis in violation of its Privacy Policy (which it was not), it was a further violation for GM to agree to that sale with the knowledge that the information would be used for an unauthorized purpose.

85.     According to the *New York Times*, LexisNexis used this driver data to create risk scores, which it in turn sold to insurance companies. Those insurers then use these risk scores to determine eligibility for auto insurance and set premiums.

86.     GM knew that those uses were unauthorized but nonetheless proceeded with the sale of its customers' driver data in violation of its Privacy Policy.

20

87.     Moreover, both GM and LexisNexis understood that the driver data they collected, packaged, and sold could often be inaccurate or lack critical context and that the sale of such erroneous data would very likely harm innocent customers including Plaintiffs and the Class.

### E. GM's Privacy Violations Harmed Plaintiffs and Class Members

88.     GM's wrongful disclosure of sensitive driver data directly harmed Plaintiffs and Class Members.

89.     Plaintiff Carnine purchased his Chevy Volt in July of 2018. Plaintiff Carnine saw his insurance premiums more than double in the past 18 months, and his premiums are now approximately $8,000 per year.  Plaintiff Carnine has had no accidents, tickets, or insurance claims in the past five years. Upon investigation, Mr. Carnine discovered that his vehicle was not only sending driving information without his consent, but that its internal time stamp appeared to be off by approximately 7 hours, among other defects. Late night driving, which would appear to be the case due to the car's error, would flag as a major risk factor for insurance companies.

90.     But for GM's wrongful sharing of driver data, including erroneous and inaccurate data, Plaintiff Carnine's insurance premiums would not have increased (or would have increased far less).

91. Plaintiff Weaver purchased his new 2023 Corvette in April 2023. Six months later, Plaintiff Weaver's insurance spiked by more than 30% from approximately $145 per month to approximately $200 per month. Plaintiff Weaver has had no accidents, tickets, or other driving incidents that could account for this increase. Plaintiff Weaver's insurance carrier did not explain the reason for the increase. Plaintiff Weaver never agreed or authorized his driver data to be shared. However, his information was shared with LexisNexis.

92. But for GM's wrongful sharing of driver data, including erroneous and out of context data, Plaintiff Weaver's insurance would not have increased (or would have increased far less).

93. Plaintiff Jordan purchased his new Chevrolet Colorado in May 2023. In January 2024, his 6-month insurance premium spiked by more than 30% from $230 a month to $300 a month. Plaintiff. Jordan has had no accidents, tickets, or other driving incidents that could account for this increase. When Plaintiff Jordan asked his insurance carrier for the reason for the increase, it declined to provide any explanation. He never agreed or authorized his driver data be shared. However, his driver data was shared with LexisNexis (and, in turn, insurance companies).

94. But for GM's wrongful sharing of driver data, including erroneous and out of context data, Plaintiff Jordan's insurance premiums would not have increased (or would have increased far less).

95.     Plaintiff Mackey purchased his Cadillac CT4V Blackwing in December 2023. Plaintiff Mackey was quoted an insurance rate of approximately $3,600 every six months before he purchased his new GM vehicle. After the purchase of the vehicle, and after his driver data was secretly sent to LexisNexis and insurance companies, his insurance company increased his rate to approximately $7,400 every six months.

96.     Even after shopping around, Plaintiff Mackey was only able to obtain insurance for $6,200 each six months from a new provider, all of which needed to be paid up front. Plaintiff Mackey never authorized, nor was he ever informed, that any of his driver data would be shared.

97.     When Plaintiff Mackey contacted GM, they repeatedly assured him that the OnStar Smart Driver "feature" was turned off and his data was not being shared. Nevertheless, when Plaintiff Mackey requested and received his LexisNexis report, it disclosed that his driver data had indeed been sent to LexisNexis regularly without his knowledge or consent.

98.     Despite GM's repeated assurances to Plaintiff Mackey that his tracking system was turned off and no data was being collected, his data was surreptitiously transmitted to LexisNexis and, in turn, to insurance companies.

99.     But for GM's wrongful sharing of driver data, including erroneous and inaccurate data, Plaintiff Mackey's insurance would not have increased (or would have increased far less).

100.    Plaintiff Skyers purchased his new high performance Cadillac CTS-V in 2019. Plaintiff Skyers has had his insurance increase massively over the past year and a half.   Plaintiff Skyers owns a high-performance Cadillac CTS-V and participates in events at racetracks. Even though Plaintiff Skyers has driven his car legally and safely on a high-performance racetrack, because his driver data was shared without his consent and the shared data lacks context such as location, it would inaccurately profile him as a very unsafe driver.

101.    Plaintiff Skyers has seen his insurance premiums vastly increase from $3,300 every six months to more than $6,000 every six months. Plaintiff Skyers did not opt into, nor would he ever opt into, anything which would send his driver data to third parties for any reason.

102.    Nevertheless, GM collected and sold Plaintiff Skyers' driver data without his knowledge or consent.

103.    But for GM's wrongful sharing of driver data, including erroneous and out of context data, Plaintiff Skyers insurance premium would not have increased (or would have increased far less).

104.   As a result of GM's unlawful and unauthorized disclosure of driver data, Plaintiffs' auto-insurance premiums have vastly increased.

105.   Plaintiffs and Class Members did not and would not authorize GM to collect, let alone sell or share, their driver data. This harm is significant and will continue for the foreseeable and indefinite future.

106.   Insurance companies cannot be compelled to forget information they wrongfully received regardless of whether the information was accurate or (as it frequently was here) false. For the foreseeable and indefinite future, Plaintiffs will be compelled to spend thousands of dollars more each year to receive automobile insurance than they would have needed to spend to receive the same policy if GM had not illegally shared their driver data.

107.   Moreover, even those who have not yet seen insurance increases have permanently lost control over and the value of their driver data. As documented by the major insurance increases of Plaintiffs, insurance companies, among other entities, place an extremely high value upon such data. Plaintiffs and Class Members' data, now sold and widely dispersed, cannot be reclaimed.

108.   At all relevant times, GM knew or should have known that Plaintiffs and the Class did not knowingly consent to their driver data being sold or shared with data brokers or insurance companies.

109.   GM understood that this driver data, if provided to insurance companies, would likely be used in ways that would be adverse to its customers. GM also knew or should have known that much of the driver data it gathered painted a fundamentally flawed and incomplete picture of its customers' driving records.

110.   Accordingly, Plaintiffs and Class Members have been injured by GM's practices and are owed redress for those injuries.

## CLASS ACTION ALLEGATIONS

111.   Pursuant to Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action individually on behalf of themselves and on behalf of the following Classes:

**Nationwide Class:** All persons within the United States who had their driver data collected and shared by GM with LexisNexis without their consent.

**California Subclass**: All persons within California who had their driver data collected and shared by GM with LexisNexis without their consent.

**Florida Subclass:** All persons within Florida who had their driver data collected and shared by GM with LexisNexis without their consent.

**Nevada Subclass:** All persons within Nevada who had their driver data collected and shared by GM with LexisNexis without their consent.

112.   Excluded from the Nationwide Class and Subclasses are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the

Nationwide Class and Subclasses are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

113. This action is brought and may be properly maintained as a class action pursuant to Rule 23. This action satisfies the requirements of Rule 23, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

114. **Numerosity.** The Nationwide Class and Subclasses are so numerous that the individual joinder of all members is impracticable. While the Nationwide Class and Subclasses' exact numbers are currently unknown and can only be ascertained through appropriate discovery, Plaintiffs, on information and belief, allege that the Nationwide Class includes at least tens of millions of individuals and that each state Subclass contains at least hundreds of thousands of individuals.

115. **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Nationwide Class or Subclass Members. These common questions, which do not vary among Nationwide Class or Subclass Members, and which may be determined without reference to any Nationwide Class or Subclass Member's individual circumstances, include, but are not limited to:

a. Whether GM collected Plaintiffs and Class Members' driver data;

b.      Whether Plaintiffs and Class Members consented to the collection of their driver data;

c.      Whether GM shared Plaintiffs and Class Members' driver data with third parties, including LexisNexis and insurance companies;

d.      Whether Plaintiffs and Class Members "expressly consented" to the sharing of their driver data with third parties, including LexisNexis and insurance companies;

e.      Whether LexisNexis violated the Fair Credit Reporting Act;

f.      Whether GM violated the UCL, CLRA, CIPA, FDUTPA, and NCFA.

g.      Whether GM's practices were unfair or deceptive;

h.      Whether GM's practices were an invasion of privacy;

i.      Whether GM's deceptive statements were intentional or willful;

j.      Whether Plaintiffs and Class Members were harmed by GM's sale of their driver data;

k.      Whether Plaintiffs and Class Members are entitled to compensatory, consequential, statutory, punitive, general, nominal, other forms of damages, and other monetary relief; and

l.      Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, or disgorgement.

116. **Typicality.** Plaintiffs' and Class Members' claims are typical of other Nationwide Class and Subclass Members' claims because they were subjected to the same allegedly unlawful conduct and damaged in the same way.

117. **Adequacy of Representation.** Plaintiffs are adequate Class representatives because they are Nationwide Class and Subclass Members, and their interests do not conflict with the Nationwide Class or Subclasses' interests. Plaintiffs retained counsel who are competent and experienced in class action and data privacy litigation. Plaintiffs and their counsel intend to prosecute this action vigorously for the Nationwide Class's and Subclasses' benefit and will fairly and adequately protect their interests.

118. **Predominance and Superiority.** The Nationwide Class and Subclasses can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Nationwide Class or Subclass Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Nationwide Class and Subclass member's claim is impracticable.

119. Even if each Nationwide Class or Subclass member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the

courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

120. **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Classes, making final injunctive relief or corresponding declaratory relief appropriate.

## **CLAIMS FOR RELIEF**

### **COUNT I**
### **UNJUST ENRICHMENT**
### **(On Behalf of All Plaintiffs and the Nationwide Class Against All Defendants)**

121.   Plaintiffs and Class Members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

122.   Plaintiffs and Class Members owned or leased GM vehicles equipped with services provided by GM, which collected their driver data without their informed consent.

123.   GM, without the consent or knowledge of Plaintiffs and Class Members, sold their driver data to data brokers such as LexisNexis.

124.   LexisNexis, upon receiving the driver data from GM utilized it for various commercial purposes, including, but not limited to, the creation and dissemination of consumer reports which were sold to third parties, including insurance companies.

125.   Defendants unjustly enriched themselves by commercially benefiting Plaintiffs and Class Members' driver data.

126.   Defendants' exploitation of Plaintiffs and Class Members' driver data constitutes a conferral of a direct benefit without just compensation.

127.   Plaintiffs and the Class Members did not knowingly allow Defendants to exploit their driver data for commercial gain.

128. If Plaintiffs and the Class Members had been informed of Defendants' intentions to profit from their driver data, they would not have consented to such use.

129. Defendants' retention of the benefits without proper compensation to Plaintiffs and Class Members is unjust and warrants restitution.

130. As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and Class Members have suffered damages.

131. Plaintiffs and Class Members have no adequate remedy at law.

**COUNT II**
**FAIR CREDIT REPORTING ACT ("FCRA")**
**15 U.S.C. § 1681e(b)**
**(On Behalf of All Plaintiffs and the Nationwide Class Against LexisNexis)**

132. Plaintiffs and Class Members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

133. The FCRA governs access to consumer credit report records and promotes accuracy, fairness, and the privacy of personal information assembled by consumer reporting agency agencies.

134. The FCRA prescribes that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

135.   LexisNexis is a "consumer reporting agency" for the purposes of the FCRA, 15 U.S.C. § 1681a(f).

136.   LexisNexis obtains driver data from GM and furnishes it to third parties, including auto insurance companies, without Plaintiffs' and Class Members' full knowledge and consent. Such driver data includes, but is not limited to, hard braking events, hard acceleration events, speeds over 80mph, average speed, late night driving, seat belt usage, when and where these events occur, and the number of miles driven.

137.   LexisNexis's providing of credit information, including driver data to third parties, constitutes the furnishing of consumer reports under the FCRA and an impermissible purpose and use of data under the FCRA.

138.   LexisNexis failed to implement procedures to maintain accuracy regarding Plaintiffs and Class Members' driver data and their driving abilities.

139.   LexisNexis knowingly and willfully engaged in the collection and production of inaccurate data metrics regarding Plaintiffs and Class Members' driving behaviors and abilities.

140.   As a result of LexisNexis's actions, auto insurance companies, and others, who view Plaintiffs' and Class Members' consumer reports receive and in turn rely on an inaccurate and misleading representation of Plaintiffs and Class Members' driving behaviors and abilities.

141. LexisNexis's deceptive acts and practices constitute willful and/or negligent violations of the FCRA, 15 U.S.C. §1681e(b).

142. For each and every willful violation of the FCRA, Plaintiffs and Class Members are entitled to actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §1681n(a)(1)-(3).

143. For each and every negligent noncompliance of the FCRA, Plaintiffs and Class Members are entitled to actual damages and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §1681o(a)(1)-(2).

## COUNT III
### CALIFORNIA UNFAIR COMPETITION LAW ("UCL")
### Cal. Bus. & Prof. Code §§ 17200, *et sq.*
### (On Behalf of Plaintiff Carnine and the California Subclass Against GM)

144. Plaintiff Carnine and California Subclass Members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

145. The UCL prohibits any unlawful, fraudulent, or unfair business acts or practices. Cal. Bus. & Prof. Code § 17200.

146. GM and Plaintiff Carnine are "persons" as defined by the UCL, Cal. Bus. & Prof. Code § 17201.

147. GM committed unlawful business practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully herein, and violating the California Constitutional right to privacy and common law; FCRA;

CLRA, Cal. Civ. Code §§ 1770(a)(5), (7), (9), and (16); CIPA; FDUTPA; NCFA, and the common law.

148. GM committed unfair business practices by, *inter alia*, misrepresenting and omitting material facts regarding the characteristics, capabilities, and benefits of the GM vehicles and the OnStar systems they were equipped with, including the following:

a. GM represented they would only collect and store data for individuals who "opted in" to the Smart Driver service, when this was untrue;

b. GM represented they would not disclose driver data they gathered without the express consent of customers, when this was untrue;

c. GM represented to customers that because their data was shared, they therefore must have opted-in to allowing data sharing with insurance companies, when this was untrue; and

d. GM failed to disclose the extent of the information they were gathering from people who used (or even people who did not use) their service when they knew that this was material to the ordinary consumer. GM's failure to disclose was complete, and to the extent that there was any disclosure at all, it was misleading.

149. There is no societal benefit from such false and misleading representations and omissions. While Plaintiff Carnine and other California

Subclass Members were harmed by this conduct, GM was unjustly enriched. As a result, GM's conduct is unfair as it has offended an established public policy.

150. GM engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

151. GM knew when the vehicles were first sold and leased that they were equipped with systems that improperly collected and transmitted information concerning drivers to third parties, including LexisNexis.

152. Plaintiff Carnine and California Subclass Members allege violations of consumer protection and unfair competition resulting in harm to consumers. GM's acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the UCL's unfair prong. There were reasonably available alternatives to further GM's legitimate business interests other than the conduct described herein.

153. GM committed fraudulent business acts and/or practices, by prominently making the representations mentioned in paragraphs 70, 71, and 172 *supra*, (which also constitute advertising within the meaning of Cal. Bus. & Prof. Code § 17200) and omissions of material facts regarding the characteristics of the vehicles, the systems they were equipped with, and their data collection and dissemination practices.

154.    GM's actions, claims, omissions, and misleading statements, as more fully set forth above and below, were also false, misleading, and likely to deceive the consuming public within the meaning of the UCL.

155.    Notwithstanding the above, GM engaged in "fraudulent" acts or practices, including but not limited to the following:

a.      GM represented that they would not collect information from customers who did not activate the ability for the customer to see some of the driver data collected using the built in OnStar system. Those representations were false and misleading; and

b.      GM omitted and concealed the fact that they did not employ reasonable safeguards to protect consumers' driver and, to the contrary, actively sold it to data brokers.

156.    Plaintiff Carnine and California Subclass Members transacted with GM in California by, among other things, creating, using, and purchasing and maintaining their GM-manufactured vehicles and/or subscribing, using, or even having by default OnStar accounts while in California.

157.    Plaintiff Carnine and California Subclass Members were deceived in California when they purchased their vehicles and/or enrolled in OnStar when GM misled them (or failed to disclose to them) that they were sharing their driver data with data brokers such as LexisNexis for an unauthorized purpose.

158.   As a direct and proximate result of GM's unfair, unlawful, and fraudulent acts and practices, Plaintiff Carnine and California Subclass Members were injured, lost money or property, and suffered the various types of damages alleged herein.

159.   The UCL states that an action may be brought by any person who has "suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.

160.   Plaintiff Carnine and California Subclass Members were deceived as a result of their reliance on GM's material representations and omissions.

161.   Plaintiff Carnine and California Subclass Members suffered injury in fact and lost money as a result of purchasing deceptively advertised GM vehicles, including vehicles advertised as having limited-time free OnStar services, by having: (i) having their privacy invaded and the diminution of that privacy; (ii) having their driver data collected and transmitted to third parties without their informed knowledge and consent; (iii) loss of benefit of the bargain damages; (iv) paying more than they would have for their GM vehicles and included OnStar services had they known that the vehicles were equipped with systems that collect and disseminate their driver data but for GM's deceptive and unfair acts; and (v) increased insurance premiums.

162.   Unless stopped and enjoined, GM will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

163.   Plaintiff Carnine and California Subclass Members seek restitution from GM of all money obtained from Plaintiff Carnine and California Subclass Members collected as a result of unfair competition; an injunction prohibiting GM from continuing such practices; corrective advertising; and all other relief this Court deems appropriate, consistent with Cal. Bus. & Prof. Code § 17203.

**COUNT IV**
**CALIFORNIA CONSUMERS LEGAL REMEDIES ACT ("CLRA")**
**Cal. Civ. Code §§ 1750, *et seq*.**
**(On Behalf of Plaintiff Carnine and the California Subclass Against GM)**

164.   Plaintiff Carnine and California Subclass Members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

165.   The CLRA, Cal. Civ. Code §§ 1750, *et seq*., is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

166.   GM are "persons" as defined by Civil Code §§ 1761(c) and 1770 and have provided "services" as defined by Civil Code §§ 1761(b) and 1770.

167.    Plaintiff Carnine and the California Subclass are "consumers" as defined by Civil Code §§ 1761(d) and 1770 and have engaged in a "transaction" as defined by Civil Code §§ 1761(e) and 1770.

168.    GM's conduct misrepresented the characteristics, qualities, benefits and capabilities of the GM vehicles and the installed OnStar system, or omitted material information, which violates the CLRA.

169.    Specifically, GM violated the CLRA by omitting material facts and failing to disclose their data collection and transmission practices, engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions that were intended to result in, and did result in, the collection and dissemination of Plaintiff Carnine's and California Subclass Members' driver data:

a.    Representing that the GM vehicles equipped with the data collection and dissemination systems have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have, under Cal. Civ. Code § 1770(a)(5);

b.    Representing that the GM vehicles equipped with the data collection and dissemination systems are of a particular standard, quality, or grade if they are of another, under Cal. Civ. Code § 1770(a)(7);

c.    Advertising the GM vehicles equipped with the data collection and dissemination systems with intent not to sell them as advertised, under Cal. Civ. Code § 1770(a)(9); and

40

d.     Representing that the GM vehicles equipped with the data collection and dissemination systems were supplied in accordance with previous representations when they have not, under Cal. Civ. Code § 1770(a)(16).

170.   GM violated the CLRA by selling and leasing vehicles that they knew collected and transmitted driver data to LexisNexis.

171.   GM omitted from Plaintiff Carnine and California Subclass Members the material fact that GM vehicles were sold with these systems that collected and disseminated the GM vehicles' driver data to LexisNexis. This is a fact that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

172.   GM further expressly represented in its California Privacy Policy that it would not "share" or "sell" the type of data it subsequently "shared" and "sold" to LexisNexis and insurance companies.

173.   GM knew, at the time it sold Plaintiff Carnine and California Subclass Members their GM vehicles, of the material fact that the vehicles were equipped with data collection and dissemination systems. It also knew that those systems could be, and in fact were, activated by GM and used to surreptitiously collect driver data without Plaintiff Carnine and California Subclass Members' knowledge or consent.

174.   GM's representations and omissions were material because they were likely to deceive reasonable consumers about the use of Plaintiff Carnine and California Subclass Members' driver data (and the acquisition, retention, sale, and sharing practices thereof).

175.   Had GM disclosed to Plaintiff Carnine and California Subclass Members that they would, at any time, regardless of what setting Plaintiff Carnine and California Subclass members enabled, (a) relay detailed telemetry information each time they used their vehicle, including information which may be inaccurate and lacks critical context, and (b) would sell this data to data brokers, which could cost customers thousands of dollars a year with no readily available remedy, GM would have been unable to continue in business.

176.   Accordingly, GM would have been forced to adopt reasonable data measures and comply with the law and ordinary customer expectations. GM was entrusted with sensitive and valuable data regarding millions of consumers, including Plaintiff Carnine and the California Subclass. GM accepted the responsibility of protecting this data while keeping the inadequate state of its true policies and practices secret from the public.

177.   Accordingly, Plaintiff Carnine and California Subclass Members acted reasonably in relying on GM's misrepresentations and omissions, the truth of which they could not have discovered.

178.   GM's conduct was fraudulent, wanton, and malicious.

179.   GM's unfair and deceptive acts or practices were the foreseeable and the actual cause of Plaintiff Carnine's and California Subclass Members suffering actual damage on account of receiving a vehicle that contained systems that collected and transmitted data to third parties.

180.   As a direct and proximate result of GM's violations of California Civil Code § 1770, Plaintiff and California Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein,

181.   Plaintiff Carnine and California Subclass Members paid for a vehicle that was supposed to meet certain specifications. Plaintiff Carnine and California Subclass Members paid for OnStar services through monthly subscriptions or inclusive with the retail price of the vehicle, where they had the reasonable expectation that their driver data would not be shared with LexisNexis.

182.   When they received a vehicle that did not conform to these specifications, and which fell below the standards set by and described in GM's representations, Plaintiff Carnine and California Subclass Members were damaged on account of (i) having their privacy invaded and the diminution of that privacy; (ii) having their driver data collected and transmitted to third parties without their informed knowledge and consent; (iii) loss of benefit of the bargain damages; (iv)

paying more than they would have for their GM vehicles and OnStar services had they known that the vehicles were equipped with systems that collect and disseminate their driver data but for GM's deceptive and unfair acts; and (v) increased insurance premiums.

183.   Plaintiff Carnine and California Subclass Members suffered diminution in the value of their driver data and GM vehicles, and other damages recoverable under the law.

184.   Plaintiff Carnine, on behalf of himself and the California Subclass, demands judgment against GM under the CLRA for injunctive relief.

185.   Plaintiff Carnine, on behalf of himself and the California Subclass, further intends to seek compensatory and punitive damages. Pursuant to Cal. Civ. Code § 1782(a), Plaintiff Carnine will serve GM with notice of their alleged violations of the CLRA by certified mail return receipt requested. If, within thirty days after the date of such notification, GM fails to provide appropriate relief for their violations of the CLRA, Plaintiff Carnine reserves his right to amend this Complaint to seek monetary damages.

186.   Notwithstanding any other statements in this Complaint, Plaintiff Carnine does not seek monetary damages in conjunction with his CLRA claim—and will not do so—until this thirty-day period has passed.

187.   Pursuant to Cal. Civ. Code § 1780(d), Plaintiff Carnine has attached the requisite CLRA venue affidavit as Exhibit 1.

**COUNT V**
**CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")**
**Cal. Pen. Code §§ 630, *et seq.***
**(On Behalf of Plaintiff Carnine and the California Subclass Against GM)**

188.   Plaintiff Carnine and California Subclass Members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

189.   CIPA provides that "[t]he Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communication and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code § 630.

190.   GM violated CIPA by storing and indefinitely tracking and then selling Plaintiff Carnine and California Subclass Members' driver data and thus determining their movements over time without their consent. Cal. Pen. Code § 637.7.

191.   CIPA, Cal. Pen. Code § 637.7(a) prohibits the use of an electronic tracking device to determine the location or movement of a person.

192.   As used in CIPA, Cal. Pen. Code § 637.7, "electronic tracking device" means "any device attached to a vehicle or other movable thing that reveals its

45

location or movement by the transmission of electronic signals." Cal. Pen. Code §
637.7(d).

193. In direct violation of this prohibition, and without the consent of
Plaintiff Carnine or California Subclass Members, GM continued to record, store,
and use the location and movement of Plaintiff Carnine's and California Subclass
Members' vehicles and provided that information to third parties, such as
LexisNexis.

194. GM utilized "electronic tracking devices," as defined by CIPA, Cal.
Pen. Code § 637.7(d), in that GM used "devices"—including the vehicles' own
telematics systems, including, but not limited to, onboard diagnostics systems and
built-in GPS, which are mechanical or electronic equipment—attached to, and
located within, Plaintiff Carnine's and California Subclass Members' vehicles to
"reveal[] its location or movement by the transmission of electronic signals."

195. GM unlawfully used those electronic tracking devices "to determine
the location or movement of" Plaintiff Carnine and California Subclass Members.

196. GM engaged in such storage and tracking of Plaintiff Carnine's and
California Subclass Member's movement after GM had affirmatively (but falsely)
misrepresented that they would not store and track their movement and transmit to
third parties.

197.   As a result of GM's violations of CIPA, Cal. Pen. Code § 637.7, and

pursuant to CIPA, Cal. Pen. Code § 637.2, Plaintiff Carnine and California

Subclass Members are entitled to the following relief:

a.      A declaration that GM's conduct violates CIPA;

b.      Statutory damages and/or trebled actual damages;

c.      Injunctive relief in the form of, *inter alia*, an order enjoining GM from

collecting and transmitting driver data to third parties in violation of CIPA;

d.      Injunctive relief in the form of, *inter alia*, an order requiring GM to

destroy all driver data created or otherwise obtained; an

e.      An award of reasonable attorneys' fees and costs as provided by CIPA

and all other applicable laws.

## COUNT VI
## INVASION OF PRIVACY UNDER THE CALIFORNIA CONSTITUTION
### (On Behalf of Plaintiff Carnine and the California Subclass Against GM)

198.   Plaintiff Carnine and California Subclass Members reallege and

incorporate by reference all preceding paragraphs as if fully set forth herein.

199.   Article I, section I of the California Constitution expressly protects a

right to privacy.

200.   Plaintiff Carnine and California Subclass Members have an

objectively reasonable expectation of privacy for their driver data. This type of

information was gathered by GM every time the vehicle was turned on and

includes but is not limited to breaking and hard breaking events, acceleration events, speeds over 80 miles per hour, average speed, dates and times of driving including late night driving, seat belt usage, and number of miles driven.

201.   Plaintiff Carnine and California Subclass Members have a reasonable interest in keeping this information private and preventing its widespread sharing, disclosure, and misuse by GM.

202.   Plaintiff Carnine and California Subclass members did not consent to GM collecting and sharing this information. Plaintiff Carnine and the California Subclass had no knowledge that GM were collecting and selling this information or with whom they shared it.

203.   GM intentionally disclosed this driver data for business profit. This was both an intrusion into the seclusion of Plaintiff Carnine and the California Subclass and was a misuse of their personal property.

204.   GM's sale of this driver data to data brokers such as LexisNexis without consultation, notice, or compensation, and which directly harmed customers, was a breach of trust and of California Privacy protections.

## <u>COUNT VII</u>
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA")
## Fla. Stat §§ 501.201, *et seq.*
## (On Behalf of Plaintiffs Mackey and Skyers and the Florida Subclass

205.   Plaintiffs Mackey and Skyers and Florida Subclass Members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

206.   Plaintiffs Mackey and Skyers and Florida Subclass Members are "consumers" within the meaning of FDUTPA, Fla. Stat. § 501.203(7).

207.   The actions of GM occurred in the context of conducting "trade or commerce" within the meaning of FDUTPA, Fla. Stat. § 501.203(8).

208.   GM engaged in unfair and deceptive acts in the conduct of any trade or commerce in violation of the FDUTPA, Fla. Stat. §§ 501.201, *et seq.*

209.   GM deceptively collected, shared, sold, and published Plaintiffs Mackey's and Skyers's and Florida Subclass Members' driver data, thereby infringing upon their privacy rights.

210.   Plaintiffs Mackey and Skyers and Florida Subclass Members did not provide their informed consent to GM.

211.   GM shared this driver data with LexisNexis violating Plaintiffs Mackey's and Skyers's and Florida Subclass Members' reasonable expectations of privacy.

212.   The dissemination of driver data by GM resulted in the misleading representation of Plaintiffs Mackey's and Skyers's and Florida Subclass Members' driving behaviors and abilities.

213.   This misrepresentation has the potential to, and in some cases has, adversely affected Plaintiffs Mackey's and Skyers's and Florida Subclass Members' abilities to obtain fair insurance premiums and other consumer benefits.

214.   GM's conduct has directly and proximately caused harmed to Plaintiffs Mackey and Skyers and Florida Subclass Members, including but not limited to financial harm through (i) having their privacy invaded and the diminution of that privacy; (ii) having their driver data collected and transmitted to third parties without their informed knowledge and consent; (iii) loss of benefit of the bargain damages; (iv) paying more than they would have for their GM vehicles and OnStar subscriptions had they known that the vehicles were equipped with systems that collect and disseminate their driver data but for GM's deceptive and unfair acts; and (v) increased insurance premiums.

215.   GM's actions as described above constitute unfair methods of competition, unconscionable acts or practices, and deceptive acts or practices in the conduct of any trade or commerce within the meaning of FDUTPA, Fla. Stat. § 501.204(1).

216.   Plaintiffs Mackey and Skyers and Florida Subclass Members have suffered actual damages and are entitled to legal relief, including, but not limited to restitution and injunctive relief.

217.   Plaintiffs Mackey and Skyers and Florida Subclass Members are also entitled to reasonable attorneys' fees and litigation expenses.

**COUNT VIII**
**NEVADA CONSUMER FRAUD ACT ("NCFA")**
**Nev. Rev. Stat. §§ 41.600, et seq.**
**(On Behalf of Plaintiff Jordan and the Nevada Subclass Against GM)**

218.   Plaintiff Jordan and Nevada Subclass Members reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

219.   The NCFA, Nev. Rev. Stat. § 41.600, states: "[a]n action may be brought by any person who is a victim of consumer fraud."

220.   As used in NCFA, "consumer fraud" means "[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925," known as the Nevada Deceptive Trade Practices Act ("NDTPA"). Nev. Rev. Stat. § 41.600(e).

221.   GM's conduct misrepresented the characteristics, qualities, benefits and capabilities of the GM vehicles and the OnStar system, or omitted material information, which violates the NCFA.

222.   Specifically, GM violated the NCFA by omitting material facts and failing to disclose their data collection and transmission practices, engaging in the following practices proscribed by Nev. Rev. Stat. Ann. §§ 598.0915 and 598.023

in transactions that were intended to result in, and did result in, the collection and

dissemination of Plaintiff Jordan's and Nevada Subclass Members' driver data:

a. Representing that the GM vehicles equipped with the data collection and dissemination systems have approval, characteristics, uses, benefits, or quantities which they do not have under Nev. Rev. Stat. Ann. § 598.0915(5);

b. Representing that the GM vehicles equipped with the data collection and dissemination systems are of a particular standard, quality, or grade if they are of another, under Nev. Rev. Stat. Ann. § 598.0915(7);

c. Advertising the GM vehicles equipped with the data collection and dissemination systems with intent not to sell them as advertised, under Nev. Rev. Stat. Ann. § 598.0915(9);

d. Knowingly makes any other false representation in a transaction, under Nev. Rev. Stat. Ann. § 598.0915(15);

e. Failing to disclose that GM would sell or disclose driver data, including inaccurate and incomplete driving data, to LexisNexis and insurance companies, a material fact in connection with the sale or lease of the GM vehicles and OnStar under Nev. Rev. Stat. Ann. § 598.0923(1)(b);

f. Violating a state or federal statute or regulation, namely the FCRA, CLRA, UCL, CIPA, FDUTPA, NCFA, and NDTPA relating to the sale or lease of the GM vehicles and OnStar under Nev. Rev. Stat. Ann. § 598.0923(1)(c); and

g. Using an unconscionable practice in a transaction concerning the sale or lease of the GM vehicles and OnStar under Nev. Rev. Stat. Ann. § 598.0923(1)(e).

223.   GM violated the NCFA and NDTPA by selling and leasing vehicles that they knew collected and transmitted driver to third parties, such as LexisNexis.

224.   GM engaged in deceptive or unfair practices by engaging in conduct that is contrary to public policy, unscrupulous, and caused injury to Plaintiff Jordan and Nevada Subclass Members.

225.   Plaintiff Jordan and Nevada Subclass Members were denied a benefit conferred on them by the Nevada legislature.

226.   As a direct and proximate result of the foregoing, Plaintiff Jordan and Nevada Subclass Members suffered all forms of damages alleged herein, including but not limited to financial harm through (i) having their privacy invaded and the diminution of that privacy; (ii) having their driver data collected and transmitted to third parties without their informed knowledge and consent; (iii) loss of benefit of the bargain damages; (iv) paying more than they would have for their GM vehicles, including the associated OnStar services, than had they known that the vehicles were equipped with systems that collect and disseminate their driver data but for GM's deceptive and unfair acts; and (v) increased insurance premiums.

227.   Plaintiff Jordan's and Nevada Subclass Members' harms constitute compensable damages for purposes of Nev. Rev. Stat. § 41.600(3).

228. Plaintiff Jordan and Nevada Subclass Members seek damages and equitable relief pursuant to NCFA, Nevada Rev. Stat. § 41.600(3).

229. Plaintiff Jordan and Nevada Subclass Members also seek reasonable attorneys' fees and costs pursuant to NCFA, Nevada Rev. Stat. § 41.600(3).

## **REQUEST FOR RELIEF**

Plaintiffs, individually and on behalf of the Nationwide Class and Subclasses set forth herein, respectfully request the following relief:

a. That the Court certify this action as a class action and appoint Plaintiffs and their counsel to represent the Class;

b. That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in its unlawful collection and sharing of driver data;

c. That the Court award compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

d. That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

e. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants, as a result of Defendants' unlawful acts, omissions, and practices;

f. That the Court award Plaintiffs and the Class(es) reasonable attorneys' fees, costs, and expenses;

g. That the Court award pre- and post-judgment interest at the maximum legal rate; and

h. All other such relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all claims so triable.

Dated: April 16, 2024   /s/ Amber L. Schubert

Robert C. Schubert
Amber L. Schubert
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
Email: rschubert@sjk.law
Email: aschubert@sjk.law

Christian Levis
Amanda G. Fiorilla
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 281-8988
Fax: (914) 997-0035
Email: clevis@lowey.com
Email: afiorilla@lowey.com

Anthony M. Christina
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Tel: (215) 399-4770
Fax: (914) 997-0035
Email: achristina@lowey.com

Rod M. Johnston (P80337)
**JOHNSTON LAW, PLLC**
6911 Duchess Court
Troy, MI 48098
Tel: (586) 321-8466
Email: rod@johnstonlawflsa.com

*Attorneys for Plaintiffs and
the Proposed Classes*